IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION
No. 7:20-CV-00141

NORTH CAROLINA COASTAL FISHERIES
REFORM GROUP, JOSEPH WILLIAM
ALBEA, DAVID ANTHONY SAMMONS,
CAPTAIN SETH VERNON, CAPTAIN
RICHARD ANDREWS, and DWAYNE
BEVELL,

    Plaintiffs,

v.

CAPT. GASTON LLC; ESTHER JOY,
INC., HOBO SEAFOOD, INC.; LADY
SAMAIRA, INC.; TRAWLER CAPT.
ALFRED, INC.; TRAWLER CHRISTINA
ANN, INC.; TRAWLERS GARLAND
and JEFF, INC.; and NORTH CAROLINA
DEPARTMENT OF ENVIRONMENTAL
QUALITY, DIVISION OF MARINE
FISHERIES,

    Defendants.

**COMPLAINT**

NOW COME Plaintiffs North Carolina Coastal Fisheries Reform Group, Joseph William Albea, David Anthony Sammons, Captain Seth Vernon, Captain Richard Andrews, and Dwayne Bevell ("Plaintiffs"), by and through undersigned counsel and upon information and belief, and allege and say the following:

## INTRODUCTION

Plaintiffs live, work, and recreate in and around North Carolina's coastal waters and depend on North Carolina's fisheries. They actively advocate for improved fisheries practices in

North Carolina to ensure the long-term health of its fisheries and to mitigate if not undo the damage already caused by commercial shrimp trawling operations. Defendants operate large commercial shrimp trawling operations in North Carolina's coastal waters or are responsible for regulating those operations pursuant to federal and state laws. Each defendant independently and significantly has harmed North Carolina's coastal waters by using non-selective, destructive trawling equipment to harvest shrimp, or by allowing such shrimp trawling practices to continue despite federal and state laws prohibiting such activities. Plaintiffs bring this suit against the Defendants because their actions have violated the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 et seq., and the Plaintiffs' rights under North Carolina's Public Trust Doctrine as enshrined in the Constitution, General Statutes, and common law of the State of North Carolina.

## JURISDICTION AND VENUE

1. This action is brought pursuant to the Federal Water Pollution Control Act of 1972 ("Clean Water Act" or "Act"), 33 U.S.C. §§ 1251 et seq., for actions committed by the Defendants which have violated the Act's prohibition on discharging pollutants to and dredging in navigable waters without a permit. This Court has original jurisdiction over the Plaintiffs' federal claims pursuant to 28 U.S.C. § 1331.

2. This case also arises under the Constitution, General Statutes, and common law of the State of North Carolina. This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

3. All material events giving rise to this cause of action occurred in and along North Carolina coastal waters, including the Pamlico Sound, in Raleigh, North Carolina, and in Morehead City, North Carolina. Upon information and belief, all Defendants maintain offices

and conduct business in one or more of these locations. Venue is proper in the United States District Court for the Eastern District of North Carolina per 28 U.S.C. § 1391(b).

4. This court has authority to enter declaratory and injunctive relief pursuant to Rules 57 and 65 of the Federal Rules of Civil Procedure; 28 U.S.C. §§ 2201 and 2202; 33 U.S.C. §§ 1251 et seq. and North Carolina's Public Trust Doctrine as enshrined in the Constitution, General Statutes, and common law of the State of North Carolina.

5. This court also has authority to impose civil penalties of up to $25,000.00 per day on a party that has violated the Clean Water Act pursuant to 33 U.S.C. §§ 1319(d) and 1365.

**PARTIES**

6. Plaintiff North Carolina Coastal Fisheries Reform Group ("NCCFRG") is a nonprofit membership organization dedicated to protecting North Carolina's coastal and marine public trust resources through education, advocacy, and action. NCCFRG promotes sustainable fisheries practices that will accommodate the public's use of these resources without compromising the long-term health of the state's coastal and marine environments and economies. NCCFRG works with coastal and marine stakeholders, the State of North Carolina, and the public to restore our fisheries for current and future generations.

7. NCCFRG has dedicated substantial resources to researching current shrimp trawling practices in North Carolina coastal waters[1], and to engaging with government agencies and stakeholders to address current shrimp trawling practices' detrimental long-term environmental and economic impacts on North Carolina's fisheries.

---

[1] The term "North Carolina coastal waters" refers to inshore waters, such as Pamlico Sound, as well as those ocean waters up to three nautical miles from the shore, all of which are subject to North Carolina's jurisdiction pursuant to relevant state and federal laws. North Carolina coastal waters include coastal fishing waters, as defined by N.C. Gen. Stat. § 113-129(4).

3

8. NCCFRG's membership includes small business owners and recreational fishermen who rely on the State's fisheries for their livelihoods and recreation.

9. Plaintiff Joseph William Albea is a founding member of NCCFRG and an avid recreational fisherman who regularly fishes and recreates in the Pamlico Sound and other North Carolina coastal waters. Mr. Albea has long advocated to protect the State's recreational fishing resources and to promote sustainable commercial fishing practices.

10. Plaintiff David Anthony Sammons is a founding member of NCCFRG and an avid recreational fisherman who regularly fishes and recreates in North Carolina coastal waters. Mr. Sammons advocates to protect the State's recreational fishing resources and to promote sustainable commercial fishing practices.

11. Plaintiff Captain Seth Vernon is a professional fishing guide whose livelihood depends upon the health and quality of North Carolina's fisheries. Plaintiff Vernon also fishes and recreates in North Carolina coastal waters.

12. Plaintiff Captain Richard Andrews is a professional fishing guide whose livelihood depends upon the health and quality of North Carolina's fisheries. Plaintiff Andrews also fishes and recreates in North Carolina coastal waters.

13. Plaintiff Dwayne Bevell is a tackle shop owner whose livelihood depends upon the health and quality of North Carolina's fisheries. The majority of Plaintiff Bevell's business comes from recreational fishermen and tourists. Plaintiff Bevell also fishes and recreates in North Carolina coastal waters.

14. Defendant Capt. Gaston LLC is the owner and operator of the shrimp trawling vessel the Micah Bell. Capt. Gaston LLC is a North Carolina corporation, with a local office and corporate headquarters located in New Bern, North Carolina.

15. The Micah Bell typically is docked in Beaufort, North Carolina, and operates in North Carolina coastal waters, including the Pamlico Sound.

16. Defendant Esther Joy, Inc. is the owner and operator of the shrimp trawling vessel the Bridgot Denise. Esther Joy, Inc. is a North Carolina registered corporation, with a local office located in Wanchese, North Carolina, and corporate headquarters located in Suffolk, Virginia.

17. The Bridgot Denise is docked in Wanchese, North Carolina, and operates in North Carolina coastal waters, including the Pamlico Sound.

18. Defendants Hobo Seafood, Inc. and Trawlers Garland and Jeff, Inc. are North Carolina corporations owned by Lee Bland Williams and operate or have operated the shrimp trawling vessel Blackbeard.

19. Hobo Seafood, Inc. is a North Carolina corporation with a local office and corporate headquarters located in Swan Quarter, North Carolina.

20. Trawlers Garland and Jeff, Inc. is a North Carolina corporation with a local office and corporate headquarters in Scranton, North Carolina.

21. Blackbeard is docked in Swan Quarter, North Carolina, and operates in North Carolina coastal waters, including the Pamlico Sound.

22. Defendant Lady Samaira, Inc. is the owner and operator of the shrimp trawling vessel the Lady Samaira. Lady Samaira, Inc. is a North Carolina corporation with a local office and corporate headquarters located in Swan Quarter, North Carolina.

23. The Lady Samaira is docked in Swan Quarter, North Carolina, and operates in North Carolina coastal waters, including the Pamlico Sound.

24. Defendant Trawler Capt. Alfred, Inc. is the owner and operator of the shrimp trawling vessel the Birdie P. Trawler Capt. Alfred, Inc. is a North Carolina corporation with a local office and corporate headquarters located in Hobucken, North Carolina.

25. The Birdie P is docked in Hobucken, North Carolina, and operates in North Carolina coastal waters, including the Pamlico Sound.

26. Defendant Trawler Christina Ann, Inc. is the owner and operator of the shrimp trawling vessel the Christina Ann. Trawler Christina Ann, Inc. is a North Carolina corporation with a local office located in Oriental, North Carolina, and corporate headquarters located in Beaufort, North Carolina.

27. The Christina Ann is docked in Oriental, North Carolina, and operates in North Carolina coastal waters, including the Pamlico Sound.

28. When discussed collectively, the defendant corporations named in Paragraphs 14 through 27 above are referred to as "Defendant Trawling Companies" herein.

29. Defendant Trawling Companies run some of the largest shrimp trawling vessels in the State of North Carolina, and their operations extend to other states along the eastern seaboard. Some of Defendant Trawling Companies are subsidiaries of or otherwise affiliated with multinational seafood corporations.

30. Defendant North Carolina Department of Environmental Quality, Division of Marine Fisheries ("Defendant Agency") is the state agency charged with protecting the State's marine and estuarine fisheries through administration, regulation, and enforcement. Per the Defendant Agency, it is "dedicated to ensuring sustainable marine and estuarine fisheries and habitats for the benefit and health of the people of North Carolina." DMF, http://portal.ncdenr.org/web/mf/ (last visited July 15, 2020).

31. Defendant Agency's fisheries management responsibilities include managing the State's shrimp and finfish fisheries and administering and enforcing state regulations applicable to shrimp trawling operations that operate in North Carolina coastal waters.

32. When discussed collectively, Defendant Trawling Companies and Defendant Agency are referred to as "Defendants" herein.

## FACTS

33. Known as the "fishing gem of North Carolina," the Pamlico Sound is the largest embayed estuary in the world. Albemarle-Pamlico National Estuary P'ship, *The Albemarle-Pamlico Region*, https://apnep.nc.gov/our-estuary/albemarle-pamlico-region#:~:text=Spans%20of%20up%20to%2040,miles%20wide%20in%20some%20places. (last visited July 15, 2020).

34. The Pamlico Sound is part of the larger Albemarle-Pamlico estuary, which Congress designated as "an estuary of national significance" in 1987, and currently is listed as one of "America's Great Waters" by the National Wildlife Federation's Great Waters Coalition. Albemarle-Pamlico National Estuary P'ship, *Our Estuary*, https://apnep.nc.gov/our-estuary#:~:text=The%20Albemarle%2DPamlico%20estuary%20was,produce%20more%20food%20per%20acre (last visited July 15, 2020).

35. The Pamlico Sound provides essential habitat for juvenile pink, white, and brown shrimp species, and is home to mature shrimp of those species that are harvested for commercial sale.

36. The Pamlico Sound also provides essential spawning and nursery habitat for many finfish species, including recreationally- and economically-important species like the

southern flounder, spot, Atlantic croaker, weakfish (gray trout), red drum, speckled trout, and striped bass.

37. When left undisturbed by commercial fishing operations, juvenile finfish remain in the Pamlico Sound until they may migrate to nearshore ocean waters.

38. Defendant Trawling Companies harvest shrimp from the Pamlico Sound by dragging trawl nets, which include otter trawls and skimmer trawls, along the bottom of the Sound. DMF, SHRIMP, *Farfantepenaeus aztecus, Farfantepenaeus duorarum, Litopenaeus setiferus*, http://portal.ncdenr.org/web/mf/shrimp (last visited July 28, 2020). Defendant Trawling Companies primarily use otter trawls. This equipment captures shrimp and whatever other fish and marine species that are unable to escape from the trawls or nets.

39. Commercial shrimping equipment and practices are non-selective and routinely result in non-shrimp species being caught, injured, killed, and discarded. These "unwanted" fish and marine species caught during commercial shrimping expeditions are referred to as "bycatch." NOAA, *National Bycatch Report*, Feb. 18, 2018, https://www.fisheries.noaa.gov/resource/document/national-bycatch-report.

40. It is generally accepted that for every one pound of shrimp harvested in North Carolina coastal waters, roughly four pounds of bycatch are discarded. *E.g.*, N.C. Wildlife Fed'n, *Unintended Consequences*, N.C. Wildlife Fed'n Journal 2 (Spring 2014), https://ncwf.org/wp-content/uploads/ncwf-journal-spring-2014.pdf.

41. Shrimp trawling operations discard the majority of bycatch back into coastal waters. This large-scale disposal of dead and decomposing fish and marine species results in significant increases in organic matter and nutrient pollution in the marine environment. Such

pollution encourages eutrophication, which decreases dissolved oxygen levels in the water, among other deleterious pollution effects.

42. This discarded bycatch equates to a huge number of fish. For example, in 2017 commercial shrimping operations caught nearly fourteen million pounds of shrimp in North Carolina waters. DMF, SHRIMP, *Farfantepenaeus aztecus, Farfantepenaeus duorarum, Litopenaeus setiferus*, http://portal.ncdenr.org/web/mf/shrimp (last visited July 28, 2020), with about 8.5 million pounds coming from the Pamlico Sound estuary. Applying the accepted bycatch ratio of four pounds of bycatch for every pound of shrimp caught to the total pounds of shrimp caught results in about 34 million pounds of bycatch caught and discarded in the Pamlico sound estuary in 2017. One Division of Marine Fisheries ("DMF") study found 21.8 individuals in each pound of Pamlico Sound by-catch, meaning that in 2017 the total number of non-shrimp caught and discarded by shrimp trawlers would have been on the order of 740 million individuals. Kevin Brown, *Characterization of the inshore commercial shrimp trawl fishery in Pamlico Sound and its tributaries, North Carolina* (Apr. 29, 2014), http://sedarweb.org/docs/supp/SEDAR_PW6_RD13_Brown2010_CharacterizeTrawl.pdf Similar numbers would hold for other years.[2]

43. Juvenile Atlantic croaker, spot, and weakfish (gray trout) are caught and killed at the highest rates by Pamlico Sound shrimp trawlers. *Id.* In fact, that same DMF study found that just one species out of the many species of finfish—juvenile Atlantic croaker—substantially outnumbered shrimp in the trawl nets.

---

[2] Brown calculated a bycatch ratio of 3.44 to 1, which would change the estimates in this paragraph to 29,000,000 pounds of bycatch caught and discarded in the Pamlico Sound estuary, comprised of 637,000,000 individuals.

44. Shrimping bycatch removes these many millions of juvenile fish, preventing them from joining the adult population, and also preventing them from eventually spawning and adding to future juvenile populations. As a result, some of North Carolina's fisheries have experienced steep and species-threatening declines in certain finfish populations, which at times have resulted in the fishing seasons for those species to close prematurely or not open. *E.g.*, Jack Igelman, *Proposal to Regulate Coastal Fishing Draws Strong Differences of Opinion*, Carolina Public Press, Dec. 27, 2019, https://carolinapublicpress.org/29412/proposal-to-regulate-coastal-fishing-draws-strong-differences-of-opinion/.

45. Millions of pounds of shrimp are harvested from North Carolina coastal waters each year, meaning that millions of pounds of juvenile finfish bycatch are killed and discharged back into those waters annually.

46. The decline of some of North Carolina's fisheries due to shrimp trawling has direct negative consequences for commercial and recreational fishing opportunities and North Carolina's coastal economy.

47. Compounding the problem is the fact that juvenile finfish often serve as a primary food source for high-level fish and marine species. Therefore, depleting juvenile finfish populations harms those higher-level species and diminishes their ability to survive in their current territory.

48. Shrimp trawling operations, by virtue of dragging otter trawls and other non-selective, heavy gear along the bottoms of North Carolina coastal waters, damage the habitats of bottom-dwelling species and disturb sediments, causing those sediments to become re-suspended in the water.

49. Defendant Trawling Companies are among the largest shrimp trawling operations in the State of North Carolina and trawl for shrimp in North Carolina coastal waters, including the Pamlico Sound.

50. Defendant Trawling Companies' shrimp trawling activities result in millions of pounds of bycatch, including juvenile finfish, being caught and disposed of into North Carolina coastal waters, including the Pamlico Sound, each year.

51. Defendant Trawling Companies' shrimp trawling activities result in the bottoms of ecologically- and commercially-important fisheries being dredged, thereby harming fish and marine species by destroying habitats, including oyster habitat, and re-suspending sediments that pollute coastal waters, including the Pamlico Sound.

52. Defendant Trawling Companies' shrimp trawling activities pollute and degrade North Carolina's marine and estuarine environments.

53. Defendant Trawling Companies' shrimp trawling activities harm fish and other marine species, threatening and endangering their ability to propagate and maintain their populations.

54. Degraded marine and estuarine habitats and declining fish and marine species populations directly threaten the State's coastal economy that depends upon commercial and recreational fishing and tourism. Both commercial and recreational fishers for non-shrimp species are injured by the destruction caused by commercial shrimp trawling.

55. Defendant Agency allows Defendant Trawling Companies to continue shrimp trawling operations in the Pamlico Sound, as described above, despite its mandate to ensure sustainable marine and estuarine fisheries and habitats for the benefit and health of all North Carolinians.

## FIRST CAUSE OF ACTION AND CLAIM FOR RELIEF
### (Illegal Discharge of Pollutants into Navigable Waters, 33 U.S.C. §§ 1251 et seq.)

56. The Clean Water Act's central operative provision is found in Section 301, which prohibits "the discharge of any pollutant by any person." 33 U.S.C. § 1311(a).

57. The Act broadly defines "pollutant" as "dredged spoil, solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes, biological materials, radioactive materials, heat, wrecked or discarded equipment, rock, sand, cellar dirt and industrial, municipal, and agricultural waste discharged into water." *Id.* § 1362(6).

58. The Act defines "discharge of a pollutant" as "any addition of any pollutant to navigable waters from any point source." *Id.* § 1362(12).

59. The Act defines "point source" as "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged." *Id.* § 1362(14).

60. Federal courts have confirmed that manipulating and redepositing materials originally from a water body subject to the Clean Water Act back into that water body constitutes the discharge of a pollutant under the Act. *See, e.g., United States v. Deaton*, 209 F.3d 331, 334-37 (4th Cir. 2000) (holding that the deposit of dredged materials back into a wetland constitutes the discharge of pollutant under the Act although the deposit does not result in a net increase in the amount of material present in the wetland); *Borden Ranch P'ship v. U.S. Army Corps of Eng'rs*, 261 F.3d 810, 814-15 (9th Cir. 2001) (holding that churning up soil already in a wetland can constitute a pollutant discharge under the Act).

61. Defendant Trawling Companies' unpermitted discharges of bycatch directly back into the Pamlico Sound's coastal waters from shrimp trawling vessels constitutes an illegal discharge of a pollutant under the Clean Water Act.

62. Defendant Trawling Companies' disturbance, removal, and re-depositing of sediment as a result of pulling shrimp trawling equipment across the bottom of North Carolina coastal waters, including the Pamlico Sound, constitutes an illegal discharge of a pollutant under the Clean Water Act.

**SECOND CAUSE OF ACTION AND CLAIM FOR RELIEF**
**(Unpermitted Dredging in Navigable Waters, 33 U.S.C. §§ 1251 et seq.)**

63. The Clean Water Act requires that any person wishing to discharge dredged or filled material into navigable waters obtain a Section 404 Permit from the U.S. Army Corps of Engineers. 33 U.S.C. § 1344.

64. A prerequisite to obtaining a Section 404 Permit is receiving a Clean Water Act Section 401 Certification from the authorized state certifying agency. *Id.* § 1341.

65. The word "dredge" means "to dig, gather, or pull out with or as if with a dredge," for example "dredging oysters in the bay." Merriam-Webster, *dredge*, https://www.merriam-webster.com/dictionary/dredge (last visited July 15, 2020).

66. The term "dredged material" means "material that is excavated or dredged from waters of the United States"[3] including navigable waters 40 C.F.R. § 232.2.

---

[3] The U.S. Environmental Protection Agency defines "waters of the United States" to encompass "the territorial seas and traditional navigable waters; perennial and intermittent tributaries that contribute surface water flow to such waters; certain lakes, ponds, and impoundments of jurisdictional waters; and wetlands adjacent to other jurisdictional waters." The Navigable Waters Protection Rule: Definition of "Waters of the United States," 85 Fed. Reg. 22250 (Apr. 21, 2020) (to be codified at 33 C.F.R. pt. 328; 40 C.F.R. pts. 110, 112, 116, 117, 120, 122, 230, 232, 300, 302, and 401).

67. The term "discharge of dredged material" means "any addition of dredged material into, including redeposit of dredged material other than incidental fallback within, the Waters of the United States," including navigable waters. *Id.*

68. "Incidental fallback" refers to the *de minimus* or inconsequential redeposits of dredged material that does not or would not destroy or degrade an area of waters subject to the Clean Water Act. *See id.*; *Am. Mining Congress v. U.S. Army Corps of Eng'rs*, 951 F. Supp. 267 (D.D.C. 1997) (holding that incidental fallback refers to small volumes of dredged material redeposited in the same location from which they were removed).

69. Defendant Trawling Companies' dragging otter trawls and other non-selective equipment along the bottom of the Pamlico Sound to harvest shrimp results in the dredging of the Sound's estuarine sediments.

70. Defendant Trawling Companies' disturbance, removal, and re-depositing of large volumes of sediments beyond the sediments' original location violate the Clean Water Act's Section 404 Permit requirement.

71. Upon information and belief, Defendant Trawling Companies have not obtained Section 401 Certifications from the North Carolina Department of Environmental Quality or Section 404 Permits from the U.S. Army Corps of Engineers.

**THIRD CAUSE OF ACTION AND CLAIM FOR RELIEF**
**(North Carolina Public Trust Doctrine)**

72. The Public Trust Doctrine is an ancient doctrine originating in Roman civil law and later incorporated into common law that makes the government the trustee of natural resources for the benefit of all citizens. Under this doctrine, natural resources (including navigable waters, fisheries, and wildlife) are deemed universally important in the lives of the citizens that depend on them. *See Fabrikant v. Currituck Cty.*, 174 N.C. App. 30, 41, 621 S.E.2d

14

19, 27 (2005) (confirming that "public trust rights are 'those rights held in trust by the State for the use and benefit of the people of the State in common . . . They include, but are not limited to, the right to navigate, swim, hunt, fish and enjoy all recreational activities in the watercourses of the State and the right to freely use and enjoy the State's ocean and estuarine beaches and public access to the beaches.'") (citations omitted); The Wildlife Society, *The Public Trust Doctrine: Implications for Wildlife Management and Conservation in the United States and Canada* (2010), https://wildlife.org/wp-content/uploads/2014/05/ptd_10-1.pdf.

73. North Carolina's Public Trust Doctrine is enshrined in its Constitution, General Statutes, and common law.

74. Per the Constitution of the State of North Carolina,

> It shall be the policy of this State to conserve and protect its lands and waters for the benefit of all its citizenry, and to this end it shall be a proper function of the State of North Carolina and its political subdivisions to acquire and preserve park, recreational, and scenic areas, to control and limit the pollution of our air and water, to control excessive noise, and in every other appropriate way to preserve as a part of the common heritage of this State its forests, wetlands, estuaries, beaches, historical sites, openlands, and places of beauty….

N.C. Const. art. XIV, § 5.

75. N.C. Gen. Stat. § 1-45.1 defines "public trust rights" as

> those rights held in trust by the State for the use and benefit of the people of the State in common. They are established by common law as interpreted by the courts of this State. They include, but are not limited to, the right to navigate, swim, hunt, fish, and enjoy all recreational activities in the watercourses of the State and the right to freely use and enjoy the State's ocean and estuarine beaches and public access to the beaches.

76. Further, N.C. Gen. Stat. § 113-133.1(a) confirms that "[t]he enjoyment of the wildlife resources of the State belongs to all of the people of the State," and N.C. Gen. Stat. §

15

143-211(a) tasks Defendant Agency with achieving and maintaining "a total environment of superior quality" for the citizens to whom the State's natural resources belong.

77. North Carolina coastal waters''s fisheries are public trust resources that Defendant Agency must maintain and protect for the benefit of all North Carolinians.

78. Defendant Trawling Companies' shrimp trawling operations violate other North Carolinians' public trust rights to use and enjoy North Carolina coastal waters and their fisheries. Their annual, wanton destruction of tens of millions of fish for which they have no use violates the public trust rights of all North Carolinians to those fish, and specifically violates the public trust rights of the individual plaintiffs to share in those resources.

79. By failing to adequately regulate Defendant Trawling Companies' shrimp trawling operations and allowing them to degrade and diminish North Carolina coastal waters' fisheries, Defendant Agency has impermissibly abdicated its responsibilities under North Carolina's Public Trust Doctrine.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully prays this Court enters:

1. A judicial declaration that Defendant Trawling Companies have violated the Clean Water Act, 33 U.S.C. §§ 1251 et seq, and North Carolina's Public Trust Doctrine;

2. A judicial declaration that Defendant Agency has violated both the Clean Water Act, 33 U.S.C. §§ 1251 et seq., and North Carolina's Public Trust Doctrine;

3. An order enjoining Defendant Trawling Companies from continuing shrimp trawling operations in North Carolina's coastal waters unless and until they show that they can undertake trawling without violating the Clean Water Act and the Public Trust Doctrine by either

eliminating the destruction of non-target species or reducing that destruction to *de minimis* levels;

4. An order instructing the Defendant Agency to take such steps as are necessary and in compliance with the Clean Water Act and North Carolina's Public Trust Doctrine to regulate and decrease the levels of bycatch destroyed by Defendant Trawling Companies;

5. An order directing Defendant Trawling Companies to pay appropriate civil penalties of up to $25,000.00 per day for each Clean Water Act violation;

6. An order awarding the costs of this action to Plaintiffs; and

7. An order granting Plaintiffs such other and further relief as the Court deems proper.

This the 4th day of August 2020.

CALHOUN, BHELLA & SECHREST, LLP

BY: /s/ James L. Conner II
James L. Conner II
N.C. State Bar No. 12365
E-mail: jconner@cbsattorneys.com
Shannon M. Arata
N.C. State Bar No. 47544
E-mail: sarata@cbsattorneys.com
4819 Emperor Boulevard, Suite 400
Durham, North Carolina 27703
Telephone: (919) 887-2607
Facsimile: (919) 827-8806
*Attorneys for Plaintiffs*